[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1051 
This appeal is from a judgment rendered by the Circuit Court of Coffee County for money paid by mistake and for money had and received. Appellant claims (1) that appellee's suit for money paid by mistake and for money had and received was defective because appellant was improperly served with process at the outset of appellee's action against him; and (2) that the trial court erroneously granted appellee's motion for a directed verdict on appellant's counterclaim for malicious prosecution and false arrest.
The record before us reveals the following facts. Appellant, Harry O'Donohue, resided in Enterprise, Alabama when the events leading to this appeal began. Early in 1975 O'Donohue terminated his employment with Realty and Leasing Corporation of Dothan in order that he might devote full time to caring for his parents, both of whom were seriously ill.
Throughout the year O'Donohue and his parents maintained a savings account which was listed in the name of Kathryn O'Donohue, Harry O'Donohue, and W.F. O'Donohue, although normally only O'Donohue's father (Mr. O'Donohue) made deposits into the account.
Sometime during 1975 Mrs. O'Donohue died; thereafter, Mr. O'Donohue learned he was terminally ill with cancer. Despite his illness, Mr. O'Donohue continued to make deposits into the savings account. Shortly before his death, however, Mr. O'Donohue made several large withdrawals. Harry O'Donohue knew of these withdrawals and on several occasions he accompanied his father to the bank when the elder O'Donohue made the withdrawals.
On May 26, 1975 Mr. O'Donohue died of cancer. His death set in motion the bizarre sequence of events which led to this appeal. The day after his father's death, Harry O'Donohue went to appellee's bank (The Citizens Bank of Enterprise) to withdraw the funds which remained in the savings account listed in his and his father's names. O'Donohue carried with him a bank withdrawal book which indicated that $10,704.20 remained in the account. At the bank, however, the teller who waited on O'Donohue informed him that bank records showed $18,704.20 in the account. O'Donohue was somewhat skeptical of the teller's information and asked her to check again. She did and again reported a balance of $18,704.20. At this point O'Donohue informed her that his father had just died and that he was at the bank to get the money remaining in his father's account. He further informed the teller that he planned to divide the money between himself and his three brothers who had arrived from various parts of the United States and Okinawa to attend the funeral. O'Donohue continued by stating that he seldom saw his brothers due to the diversity of their residences, and therefore he wanted to make sure that there was no mistake with regard to the money in the account. Once again the teller called bank records and asked for the balance in the O'Donohue account. Again she was informed that $18,704.20 remained. O'Donohue testified that although he did not understand the reason for such a discrepancy in his records and those of the bank, he nonetheless concluded that his father had recently deposited the additional $8,000 without his (Harry's) knowledge.
Since the teller had called bank records three times, O'Donohue accepted her statements that the account contained $18,704.20. The teller then changed the figure in the withdrawal book from $10,704.20 to $18,704.20 and marked the account closed. O'Donohue then took the money, returned to his home, and divided it equally between himself and his three brothers. After the *Page 1052 
funeral the four brothers dispersed — one returning to his home in North Carolina, another to his military base in Okinawa, and appellant and his older brother to the latter's home in Little Rock, Arkansas.
Several days after O'Donohue had withdrawn the money, the bank discovered an error in their accounting system and in this manner learned that the $8,000 credited to the O'Donohue account on May 27 had actually been withdrawn sometime earlier. The bank notified O'Donohue's attorney that O'Donohue had been paid $8,000 by mistake. On June 9, 1975 O'Donohue's attorney notified him of the situation, and O'Donohue, who was now living in Arkansas, immediately left his home and returned to Enterprise, arriving on June 10. O'Donohue met with his attorney and then went to The Citizens Bank. At the bank O'Donohue spoke with the head cashier, Larry Tindoll. Testimony as to what was said during the conversation between the two men is in sharp conflict. Tindoll claimed that O'Donohue refused outright to return the money. O'Donohue denied that he made such a statement, claiming that he told Tindoll that he could not pay the bank at that moment because $6,000 of the money had been distributed to his brothers, but that if the bank would give him some time he would attempt to recover the funds. At this point in the conversation, O'Donohue testified that Tindoll demanded the money immediately and twice told O'Donohue that he (Tindoll) would have O'Donohue arrested if the latter failed to pay. The meeting then terminated with Tindoll telling O'Donohue that he had better get the money. Tindoll denied that he made such statements.
After his meeting with Tindoll, O'Donohue returned to Arkansas where he began his efforts to recover the money mistakenly paid to him by The Citizens Bank. A week after his return to Little Rock, on June 17, 1975, O'Donohue was arrested by the FBI on a charge of bank larceny. The warrant for O'Donohue's arrest was signed by a federal magistrate and did not disclose who had requested that the arrest be made or how the magistrate had received knowledge of the alleged offense. In October a federal grand jury indicted O'Donohue for bank robbery and in late November-early December O'Donohue was tried by a jury in federal court and acquitted of the charge against him.
After the acquittal, as O'Donohue was leaving the courthouse, an attorney for The Citizens Bank served O'Donohue with a summons and complaint stating a civil cause of action against O'Donohue for money paid by mistake and for money had and received.
After service was made on his client by the attorney for the opposing party, O'Donohue's attorney moved to quash the service of process. The trial court denied this motion. Appellant-O'Donohue contends that the motion to quash service of process was improperly denied for two reasons.
First, appellant claims that a non-resident who voluntarily appears in a forum in which he could be made to appear involuntarily is immune from service of process in a civil suit. This situation is most strikingly portrayed in circumstances such as those before us on this appeal — that is, where a non-resident indicted on a criminal charge voluntarily comes into the forum where he is charged, stands trial, and upon his acquittal is personally served with process notifying him of the civil action.
Although we recognize the importance of such a procedural question — particularly in view of the possibility that a criminal proceeding could be used as a ruse or pretext for bringing a party into the jurisdiction to be served with process — we do not believe the question was properly placed before the trial court so as to permit that court to reach a determination on it.
In appellant's brief to this court he asserts that the question of immunity from service was placed before the trial court in appellant's motion to quash service of process. We disagree. After a careful examination of the motion, we are convinced that the only aspect of it which might possibly be deemed to raise the immunity question is found in the first ground of the motion. That ground states: *Page 1053 
 "(1) That the Defendant is a resident citizen of the State of Arkansas, residing at 5908 Windamere, Little Rock, Arkansas, and was so at the time this suit was filed as was well known to the Plaintiff herein, and was so at the time the action commenced or at such time as the alleged cause of action commenced."
A reading of this ground readily reveals its inadequacy for the purpose of raising the immunity issue.
Although language in pleadings and motions which is nebulous or unclear should be read in a manner most favorable to the pleader or moving party, such liberal treatment must be denied where the pleading or motion totally fails to inform the opposing party or court as to the cause or issue on which the pleading or motion is based. A motion "shall state with particularity the grounds therefore, and shall set forth the relief or order sought." Rule 7 (b)(1), ARCP. Despite the fact that appellant's motion properly set out the relief requested, it did not state with sufficient particularity that service should be quashed because it was in violation of appellant's immunity from service. Thus the issue of immunity was not adequately presented to the trial court, and an issue which is never before that court cannot be the basis for reversal on appeal.
Appellant's second reason for claiming that his motion to quash service of process was improperly denied is that appellee's attorney was not authorized to serve appellant-O'Donohue with process.[1]
The gist of this contention is that Rule 4.1 (b)(2), ARCP, provides that service by a person other than a sheriff requires special appointment by the court. In the instant case, appellee's attorney had not been appointed by the court on December 2, 1975, the date on which he served appellant with the summons and complaint. On December 29, 1975 appellant filed a motion to quash service on the ground that appellee's attorney had not been appointed by the court to effect service; the following day the court took the unusual step of appointing appellee's attorney to serve the summons and complaint on Harry O'Donohue.
We believe that the trial court's failure to appoint a person, other than the sheriff, to effect service was improper. Nor did the subsequent appointment of appellee's attorney (after process had already been served and appellant had moved to quash service on the ground that appellee's attorney had not been appointed at the time of service) cure the defective service which occurred in this case.
Rule 4.1 (b)(2) provides:
 "As an alternative to delivery by the sheriff, process issuing from any court governed by these rules may be delivered by the clerk to any person not less than eighteen years of age, who is not a party and who has been designated by order of the court to make service of process." (Emphasis supplied.)
And the committee comments to Rule 4.1 state in part:
 "ARCP 4.1 (b)(2) authorizes the court to allow an appropriate person other than the sheriff to serve process. It is anticipated that such leave will be freely given when requested."
This rule and the comments thereto indicate that in the absence of a special appointment, personal service by someone other than the sheriff or his deputy is ineffective.
The purpose of Rule 4.1 (b)(2) is to provide more economical and efficient service, particularly in situations where service by the sheriff would involve delay or a considerable amount of travel. It is not designed as a mandate for a party's attorney to make service of process when he pleases, without supervision or authorization by a court. Since a party's attorney is in a special relationship to the case, a view of Rule 4.1 (b)(2) which would permit a party's attorney to serve process without *Page 1054 
having been designated to do so by order of the appropriate court would in effect enable a party himself (under the guise of his attorney) to make service on the individual against whom the party is bringing his action.[2] This is precisely the type situation Rule 4.1 (b)(2) seeks to prevent when it states that "[a]s an alternative to delivery by the sheriff, process issuing from any court . . . may be delivered by the clerk to any person . . . who is not a party. . . ."
Thus, if service by a person other than a sheriff or his deputy is desired, a request must be made to the court asking for the designation of a particular individual to make service. In the present case no such request was made. Nor did the trial court appoint appellee's attorney to serve Harry O'Donohue with process. Moreover, the trial court's subsequent appointment of appellee's attorney to effect service after the latter had already done so did not correct the failure of The Citizens Bank to follow the proper rules of procedure with regard to service. Therefore, the service of process made upon Harry O'Donohue was ineffective and the trial court improperly denied O'Donohue's motion to quash service.
The very purpose of service is to confer in personam
jurisdiction on a party. Rule 4.1, ARCP. In the case before us the service on O'Donohue by appellee's attorney acting without appointment by the trial court was ineffective and did not confer in personam jurisdiction on the court. And while we recognize that a party may, by his actions, waive a defect in the manner in which in personam jurisdiction is acquired, e.g.Oden v. McCraney, 235 Ala. 363, 179 So. 191, no such waiver occurred in this instance.
As we have stated earlier, the trial court improperly denied appellant's motion to quash service of process; because of this action by the court appellant was compelled to answer appellee's complaint, otherwise he would have subjected himself to a default judgment in favor of appellee. Rule 55, ARCP. Thus appellant's answer in response to appellee's complaint for money paid by mistake and for money had and received did not constitute a waiver of appellant's right to complain of defective service.
Nor did the fact that appellant filed a counterclaim against appellee for malicious prosecution and false arrest waive appellant's right to assert on appeal that the trial court failed to acquire personal jurisdiction over him.
A counterclaim is deemed to be compulsory "if there is any logical relation of any sort between the original claim and the counterclaim." Rule 13, ARCP, committee comments.
The logical relation test used in Alabama is the most liberal of several tests which are used to determine whether or not a counterclaim is compulsory. 6 Wright Miller, Federal Practiceand Procedure: Civil, § 1410. Nonetheless, the logical relation test has by far the widest acceptance among the courts. Wright Miller, supra. Basically, it allows a court to apply Rule 13 (a) to any counterclaim which should be tried with the original claim in order to avoid a substantial duplication of effort,Diamond v. Terminal Railway Alabama State Docks, 421 F.2d 228
(5th Cir.), or in which both the original claim and the counterclaim arise out of the same aggregate of operative facts in either of two respects: the first alternative being that the facts taken as a whole serve as the basis for both claims; the second alternative being that the sum total of facts upon which the original claim rests create legal rights in a party that would otherwise have remained dormant. Revere Copper Brass,Inc. v. Aetna Casualty Surety Co., 426 F.2d 709 (5th Cir.).
The record before us demonstrates that the facts which gave rise to the bank's *Page 1055 
original claim against O'Donohue also led to the latter's counterclaim for malicious prosecution and false arrest. Thus, under any or all of the aforementioned corollaries to the logical relation test appellant's counterclaim against appellee was compulsory.
Under Rule 13 (a) a party who fails to plead a compulsory counterclaim against an opposing party is deemed to have waived such claim and cannot bring it in a subsequent action. And since a party who is in a position to assert a compulsory counterclaim has no alternative but to maintain that claim against an opposing party (or lose it), his act of maintaining it does not constitute a waiver of any jurisdictional defense he previously or concurrently asserts. Neifeld v. Steinberg,438 F.2d 423 (3rd Cir.); Dragor Shipping Corp. v. Union TankCar Co., 378 F.2d 241 (9th Cir.); Hasse v. American PhotographCorp., 299 F.2d 666 (10th Cir.). Thus, appellant's assertion of his compulsory counterclaim for malicious prosecution and false arrest did not waive his right to claim that the trial court did not have in personam jurisdiction over him. Since the service which occurred in this case was ineffective, the trial court never acquired personal jurisdiction over appellant. Therefore the judgment in favor of appellee for money paid by mistake and for money had and received must be reversed.
Appellant's second assignment of error is that the trial court improperly granted appellee's motion for a directed verdict and thus prevented appellant's action for malicious prosecution and false arrest from reaching the jury.
The facts with regard to this matter are as follows. At trial O'Donohue was asked by his attorney if Mr. Tindoll (the bank cashier) had threatened to have O'Donohue arrested if the latter failed to return the money which had been mistakenly paid to him by the bank. O'Donohue replied that Tindoll had twice threatened him with arrest at their meeting on June 10. On cross-examination by appellant's attorney, Tindoll denied that he had threatened to have appellant arrested. No other evidence was presented which would indicate whether or not The Citizens Bank (or one of its employees) swore out the complaint for bank robbery upon which appellant was arrested.
At the close of the evidentiary phase of the trial, appellee's lawyer moved for a directed verdict on appellant's counterclaim for malicious prosecution and false arrest. The trial court granted this motion on the ground that appellant had not presented a scintilla of evidence which, if believed, would cause a jury to find that The Citizens Bank (or its agent) had instigated or authorized the arrest of appellant.
When the trial court granted appellee's motion for a directed verdict, O'Donohue's lawyer requested that the case be re-opened in order that appellant might call as a witness either the FBI agent who arrested appellant or the federal magistrate who signed the warrant for O'Donohue's arrest. Appellant's attorney pointed out to the court that it was necessary to call either of these persons in order to prove who had originally sworn out the complaint against appellant. The trial court denied appellant's request because appellant's attorney had announced "defendant [appellant] rests."
In his motion for a new trial, appellant attempted to submit copies of arrest records which had been located in Little Rock, Arkansas. Appellant contended that these records were "new evidence" since they had not been available to appellant at trial. The court refused to permit this evidence and rejected appellant's motion for a new trial on the grounds that the "new evidence" was not relevant in view of the fact that there was no evidence presented at trial to indicate that the bank (or its agent) had sought to have O'Donohue arrested.
We believe that the trial court erred in granting appellee's motion for a directed verdict and in its denial of appellant's motion for new trial.
It may be stated as a general rule that a party is entitled to a directed verdict where the law would not authorize a *Page 1056 
jury to render a verdict on the evidence or where a verdict by the jury would be contrary to the principles of law as applied to the facts presented at trial. However, this rule must be read in context with the Alabama "scintilla of evidence" rule. Thus, if there is a scintilla of evidence supporting the position of the party against whom the motion is made, so that his case is entitled to go to the jury, a directed verdict cannot be granted. Moreover, when a directed verdict is requested, the entire evidence must be viewed in a light favorable to the opposing party. Kilcrease v. Harris, 288 Ala. 245, 259 So.2d 797. And a directed verdict should be refused where the evidence is in conflict with regard to any material issue or where reasonable inferences may be drawn from the evidence actually presented in support of the claim against which the motion is sought. Birmingham Electric Co. v. McQueen,253 Ala. 395, 44 So.2d 598; Baker v. Patterson, 171 Ala. 88,55 So. 135.
In the instant case there was conflicting testimony as to whether appellee's cashier threatened to have O'Donohue arrested. If the jury believed that the cashier made such a threat, it would be reasonable to infer that the latter carried it out — particularly since O'Donohue was shortly thereafter arrested by the FBI.
The evidence which appellant actually presented at trial (and reasonable inferences therefrom) was sufficient to meet "the least particle" or "smallest trace" test necessary to constitute a scintilla of evidence in support of his claim that The Citizens Bank instigated his arrest. A scintilla of proof that the bank instigated his arrest was vital to O'Donohue's counterclaim against the bank for malicious prosecution and false arrest. The trial court incorrectly held that appellant had not provided such proof. Thus, the trial court granted appellee's motion for a directed verdict and thereby prevented the jury from receiving for its consideration appellant's action for malicious prosecution and false arrest. The trial court's action with regard to this matter was in error.
REVERSED AND REMANDED.
WRIGHT, P.J., and HOLMES, J., concur.
[1] Appellant stated this ground with sufficient particularity to permit its consideration by the trial court.
[2] This is not to say that a lawyer for a party cannot be appointed to make service. It is merely to say that in no other circumstance is the necessity for the court's supervision more adequately demonstrated.